IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN WADE MILNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 3:17-cv-257-GMB |
| | ) | [WO] |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

On May 26, 2013, Plaintiff Steven Wade Milner applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging a disability onset date of December 31, 2004. Milner's applications were denied at the initial administrative level. Milner then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held hearings on October 22, 2014 and February 12, 2015. On July 2, 2015, he denied Milner's claims. Milner requested a review of the ALJ's decision by the Appeals Council, which denied his request on August 8, 2016. The ALJ's decision thus became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of August 8, 2016.

Milner's case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of the undersigned United States Magistrate Judge. Based on its careful review of the parties' submissions, the

relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and this matter REMANDED to the Administrative Law Judge for further proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been described as "more

than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Id.* (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Milner bears the burden of proving that he is disabled, and he is therefore responsible for producing evidence sufficient to support his claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a). The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Is the claimant's impairment(s) severe?
(3) Does the claimant's impairment(s) satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform his former occupation?
(5) Is the claimant unable to perform other work given his residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

### III. FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

Milner was 31 years old at the time of the ALJ's decision. He is married and lives with his wife and child in Opelika, Alabama. R. 40 & 276. Milner took classes until the ninth grade and did not graduate from high school.[1] R. 39 & 257. His primary complaints are severe, chronic headaches and neck pain that have caused a variety of complications. In the past, Milner has worked as an assembler at an auto-part manufacturer, stocker and

---

[1] Milner testified at the hearing that he completed the ninth grade, but his Disability Report indicates that he completed the eleventh grade. R. 257. There is no explanation in the record for this discrepancy.

4

delivery person at a beverage distributor, forklift driver, printing press operator, waiter, and stocker at a Dollar General store, where he last worked for two months early in 2013. R. 268.

Following an administrative hearing, the ALJ found that Milner suffers from the following severe impairments under 20 C.F.R. § 404.1520(c):

> [M]igraine headaches[,] Arnold-Chiari I malformation with suboccipital craniotomy as well as occipital neuralgia and cervical pain, a history of asthma with bronchitis, otitis media, sinusitis, gastric ulcers, mild obesity, hypertension, cellulitis, and mitrovalve insufficiency/mild aortic insufficiency.

R. 15. However, the ALJ concluded at step three of the analysis that none of Milner's impairments—nor a combination of his impairments—met or medically equaled the severity of one of those listed in the applicable regulations. R. 18. The ALJ further found, at steps four and five, that Milner has the residual functional capacity ("RFC") to perform medium work with several limitations.[2] R. 24.

Ultimately, the ALJ found that while Milner could not perform his past relevant work, he could perform other jobs that exist in the national economy. R. 26. He therefore concluded that Milner was not disabled under the meaning of the Social Security Act from December 31, 2004, through the date of his decision, and denied his claims. R. 27.

According to the medical evidence of record, Milner first sought treatment for

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

headaches in 2002, when he saw Dr. Jonathan Commander in Opelika, Alabama and complained of a right-sided headache. R. 687–88. Dr. Commander prescribed two medications for the treatment of headaches. R. 687. Four years later, in 2006, Milner checked into the East Alabama Medical Center ("EAMC") emergency room complaining of chronic headaches, which he said had persisted since he was 10 years old. R. 645. He claimed the headaches were due to a history of concussions. R. 645. Dr. Kim J. Williams prescribed Lorcet and reported that Milner needed "prophylactic therapy" because his headaches were chronic. R. 646. She also noted slight spasm at the base of the neck. R. 646. The next day, Milner saw Dr. Woody Jones of West Point Family Practice complaining of pain in the back of his head that caused shaking and jerking. R. 703. Dr. Jones noted tenderness at the base of the skull and prescribed two medications. R. 703.

Milner's headaches persisted, and in 2010 he sought treatment from Dr. David G. Fagan at Lanier Primary Care after another trip to the emergency room and reported that his headaches had become worse. R. 396. Milner reported that two prescription medications—Topamax and Treximet—did not alleviate his pain, nor had any medications he was previously prescribed. R. 396. Milner described the pain as being sharp and located in the back of his head and neck, sometimes developing into a global headache that would prompt him to check in to an emergency room. R. 396. He again pointed to past concussions as a possible cause of his headaches and complained that the headaches negatively affect his focus and concentration. R. 396. Milner rated his pain a 10 on a 10-point scale and Dr. Fagan's examination revealed tenderness in his neck. R. 397. Dr. Fagan assessed Milner with chronic daily headaches and prescribed two medications, heat

treatments, and neck exercises. R. 397.

A year later, Milner was back at the EAMC emergency room complaining of a right-sided headache that had persisted for three days "from the base of his skull all the way around to the front," including behind his right eye. R. 430. Nurse practitioner Stephanie D. Huff administered two medications intravenously and prescribed another medication to take when Milner's headaches returned. R. 430. She diagnosed him with a migraine headache and observed that he was "feeling much better" after the intravenous medications. R. 430. Huff also noted that Milner "could probably go on some kind of prophylactic medication" for his headaches. R. 430. She did not note any other abnormalities upon her physical examination of Milner. R. 430.

Two years later, on April 30, 2013, Milner saw neurologist Dr. Gregory R. Lipscomb at Neurology Consultants of Montgomery, P.C., on a referral from his primary care physician, Dr. Ivan Slavich. R. 440. As he had to other healthcare professionals, Milner explained that he had experienced headaches most of his life and that they were primarily located in the back of his head and neck. R. 440. He described the pain as "burning and aching" and rated it a 10 on a 10-point scale. R. 440. He explained that nausea, dizziness, photophobia, and phonophobia accompanied his headaches. R. 440. He again connected past concussions with his headaches. R. 440. He indicated that no prescription medication has alleviated his pain, but that he had never taken a preventative medication. R. 440. Dr. Lipscomb's physical examination revealed no obvious abnormalities. R. 443. He diagnosed Milner with migraine headaches, tension headaches, and neck pain. R. 444. Dr. Lipscomb reported that he talked with Milner about

7

symptomatic and prophylactic treatment of migraine headaches, medication-overuse headaches, and tension headaches "at length." R. 444. He directed Milner to return in six weeks and referred him to a physical therapist for the neck pain. R. 445. He also ordered an MRI and prescribed Topamax for the prophylactic treatment of headaches. R. 445. Dr. Lipscomb warned Milner about the common side effects of Topamax. R. 445–46.

Milner returned to Dr. Lipscomb one month later complaining that his headaches were worsening. R. 437. He was also experiencing panic attacks and worried that they might be caused by the Topamax. R. 437. He had not yet been to physical therapy. R. 437. The MRI Dr. Lipscomb previously ordered revealed that Milner had Chiari malformation type I.[3] R. 439. Milner explained that he did not want to continue taking the Topamax because it had not been effective and resulted in unpleasant side effects. R. 439. Because of the worsening headaches and Chiari malformation, Dr. Lipscomb stated that Milner "needs to see a neurosurgeon." R. 439.

At Dr. Lipscomb's suggestion, Milner saw Dr. Robert H. Bradley, Jr., a neurosurgeon, in August 2013. R. 475. Milner claimed to suffer from neck pain, chronic headaches with a burning sensation, and "most recently depression/anxiety and panic attacks." R. 475. He reiterated that no treatment permanently cured his headaches and that his pain was a 10 out of 10. R. 475. Dr. Bradley's physical examination revealed that

---

[3] "Chiari malformations are structural defects in the cerebellum . . . . Some people with Chirai malformations may have no symptoms. Others may have symptoms such as: dizziness, muscle weakness, numbness, vision problems, headaches, [and] problems with balance and coordination." *Chiari Malformation*, WEBMD, https://www.webmd.com/brain/chiari-malformation-symptoms-types-treatment #1 (last visited July 16, 2018). Type I Chiari malformation occurs when the "lower party of the cerebellum—but not the brain stem—extends into an opening at the base of the skull," and can cause "[p]ain in the lower back of the head into the neck." *Id.*

Milner had a reduced range of motion and tenderness in the neck. R. 475. Dr. Bradley concurred with Dr. Lipscomb's Chiari malformation diagnosis, and also assessed Milner with occipital neuralgia,[4] headache, and cervical pain. R. 476. Like Dr. Lipscomb, Dr. Bradley recommended physical therapy. R. 476. He also recommended occipital blocks and, potentially, a decompressive craniectomy,[5] but noted that Milner "has little to [no] neurological findings on exam, so we will try conservative treatments first." R. 476.

On October 30, 2013, during Milner's next visit to Dr. Bradley, Milner reported that neither the physical therapy nor occipital block had improved his headaches and neck pain. R. 473. Dr. Bradley's assessment remained the same and his physical examination again revealed no significant abnormalities. R. 473–74. He was "still not convinced" that a craniectomy would solve Milner's pain and encouraged him to continue to see Dr. Lipscomb. R. 474.

A month later, Milner saw Dr. Mamerhi O. Okor in Birmingham, Alabama for a second opinion. R. 506. Milner's complaints were largely the same, except that he now complained of "numbness/tingling" in his hands over the past year and explained that his headaches were "exacerbated by coughing, sneezing, having a bowel movement . . . any activity in which he performs a Valsalva maneuver." R. 506. He had also had difficulty

---

[4] "Occipital neuralgia is a condition in which the nerves that run from the top of the spinal cord up through the scalp, called the occipital nerves, are inflamed or injured. You might feel pain in the back of your head or the base of your skull." *Occipital Neuralgia*, WEBMD, https://www.webmd.com/migraines-headaches/occipital-neuralgia-symptoms-causes-treatments#1 (last visited July 16, 2018).

[5] This procedure is "a surgery done to remove a part of [the] skull in order to relieve pressure in that area when [the] brain swells" and can be performed "to treat conditions that cause [the] brain to swell or bleed." *What is a Craniectomy?*, HEALTHLINE, https://www.healthline.com/health/craniectomy (last visited July 16, 2018).

9

swallowing and reported sleep apnea. R. 506–07. Much like the other physical examinations, Dr. Okor's examination demonstrated no significant physical abnormalities. R. 507–08. His impression was that Milner "has a symptomatic Chiari I malformation" and would benefit from a craniocervical decompression procedure. R. 508. Dr. Okor scheduled the surgery for January 2014 and directed Milner to return for a postoperative visit and testing. R. 508. Dr. Okor performed the surgery on January 23, 2014, which included four procedures: suboccipital craniectomy, C1 laminectomy,[6] duraplasty for decompression of craniocervical junction (to treat the Chiari malformation), and occipital pericranial graft harvest. R. 538.

On March 28, 2014, Milner returned to Dr. Okor for a postoperative appointment and indicated that his headaches had worsened. R. 516. He claimed that the pain was exacerbated by bending, picking up objects, and using the bathroom. R. 516. He also complained of dizziness. R. 516. Dr. Okor ordered an MRI "to ensure that his cranio-cervical decompression is adequate" and directed Milner to return. R. 516. Upon Milner's return two months later, Dr. Okor noted that the MRI revealed a "well decompressed cranio-cervical junction," although Milner's symptoms had not yet improved. R. 512. He concluded that the "best course of action is medication management." R. 512.

In the meantime, on October 16, 2013, Dr. Glenn Carmichael, a state agency medical consultant, reviewed Milner's medical records up to that point in time. R. 79–82.

---

[6] Like a craniectomy, a laminectomy is designed to create space and relieve pressure; however, it takes place in the spinal canal instead of the skull. *Laminectomy*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited July 16, 2018). Specifically, it "enlarges [the] spinal canal to relieve pressure on the spinal cord or nerves" and is employed when "[b]ony overgrowths within the spinal canal can narrow the space available for [the] spinal cord and nerves." *Id.*

Dr. Carmichael stated that Milner's headaches were "non specific" and have been "variously diagnosed as tension type, migraine, and analgesic rebound type." R. 82. He pointed out that throughout the medical records, Milner typically did not "appear distressed" despite the "alleged severity" of his headaches. R. 82. He concluded that Milner's headaches and neck pain were "non severe" impairments. R. 82.

## IV. DISCUSSION

Milner presents just two issues on appeal: (1) that the ALJ improperly evaluated Milner's statements regarding the nature and limiting effects of his symptoms and (2) that the ALJ erred in his evaluation of non-examining medical source opinions.

### A. Credibility Findings

Milner asserts that the ALJ failed to adhere to Social Security regulations and Eleventh Circuit standards for properly evaluating Milner's statements regarding his symptoms. Doc. 12 at 11–14. Specifically, he argues that the ALJ failed to apply the requisite factors in evaluating Milner's testimony and neglected to provide specific and adequate reasons for discrediting his statements concerning his pain. Doc. 12 at 13. For the following reasons, the court agrees.

To demonstrate disability based on testimony of pain or other subjective symptoms, a claimant must satisfy two parts of the Eleventh Circuit's three-part pain standard, which requires "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Certainly, an ALJ is free to

discredit a claimant's testimony. *See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). Importantly, a claimant's testimony that is supported by medical evidence and satisfies the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony." *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1259 (N.D. Ala. 2014). "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. Failure to do so requires "that the testimony be accepted as true." *Id.* In any event, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Here, Milner has submitted sufficient evidence of an underlying medical condition, and the Commissioner does not argue otherwise. Milner's medical records demonstrate that he was diagnosed with type I Chiari malformation. Over the course of at least 10 years, Milner was treated with a variety of prescription medications, physical therapy, and surgery. Accordingly, there is sufficient objective evidence in the record of an underlying medical condition.

The ALJ also concluded that Milner's underlying conditions "could reasonably be expected to cause some of the alleged symptoms." R. 24. However, he found that Milner's "statements concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely credible for the reasons explained in this decision." R. 24. As support

for his credibility finding, the ALJ noted that during most medical examinations, Milner did "not appear to be in distress" despite the "alleged severity" of his symptoms. R. 24. He pointed out that Milner "is non-specific in acknowledging his pain complaints and considering that no medications can help this alleged excruciating, worsening pain even with surgery, his allegations are not consistent with the medical evidence." R. 24. Finally, the ALJ observed that Milner had previously been diagnosed with somatoform disorder[7] and alleged that he had type II Chiari malformation while he was diagnosed with type I. R. 24. He focused on the fact that on one occasion in January 2006 Milner complained of extreme groin pain while a physical examination revealed no visible abnormalities. R. 24. The ALJ summarized the significance of this incident:

> The undersigned points this reference out only to emphasize the claimant's propensity for complaints of intractable pain levels in several which corroborate the claimant's diagnosis of a somatoform disorder, but would further corroborate the other physician's [sic] opinions and medical evidence in file of less than severe headache pain levels as well as other pain complaints.

R. 24. This, according to the ALJ, is reflective of Milner's "possible exaggeration of pain symptoms" and casts doubt on the credibility of his testimony. R. 24.

The court notes at the outset that the ALJ's credibility findings appear largely to be identical to Dr. Carmichael's. *Compare* R. 24 (explaining that Milner "does not appear

---

[7] Somatoform is "a form of mental illness that causes one or more bodily symptoms, including pain. The symptoms may or may not be traceable to a physical cause . . . . [b]ut regardless, they cause excessive and disproportionate levels of distress." *Somatic Symptom and Related Disorders*, WEBMD, https://www.web md.com/mental-health/somatoform-disorders-symptoms-types-treatment#1 (last visited July 17, 2018). "People with [somatoform] are not faking their symptoms. The distress they experience from pain and other problems they experience are real, regardless of whether or not a physical explanation can be found. And the distress from symptoms significantly affects daily functioning." *Id.*

13

distressed" during examinations "despite the alleged severity" and that he "is non-specific in acknowledging his pain complaints . . . considering that no medications can help this alleged excruciating, worsening pain even with surgery") *with* R. 84 (noting that "[o]n exams, despite the alleged severity, [Milner] does not appear distressed" and that he has been "diagnosed with non specific chest pain and somatoform disorder"). Despite referring to Milner's pain complaints as "non-specific," the medical records are replete with specific complaints of Milner's pain. Consistently, over the course of several years, Milner has complained of pain in the back and right side of his head that was sharp, burning, and rated 10 on a 10-point scale. He also has complained of pain in the back of his neck. While Milner's reported side effects have varied, he continually has reported that the headaches cause dizziness, shaking, and a lack of focus and concentration.

Further, the ALJ's statement that Milner's testimony is "inconsistent with the medical evidence" is conclusory and does not point the court toward substantial evidence in support of his decision. The court is unable to determine whether the ALJ was clearly wrong to discredit Milner's testimony because the ALJ has not articulated any clear basis for his decision to do so. This failure to "shed any meaningful light on the reasons for discounting the [claimant's] testimony" constitutes reversible error because it prevents the court from determining—without impermissibly reweighing the evidence itself—whether substantial evidence supports the ALJ's reasoning. *Robinson v. Astrue,* 2009 WL 2386058, at *3 (M.D. Fla. Aug. 3, 2009). Indeed, there is a significant difference for the purposes of a social security appeal between "summarizing evidence and analyzing it." *McCauley v. Comm'r of Soc. Sec.*, 2017 WL 4297239, at *8 (M.D. Fla. Sept. 28, 2017). And it is "the

responsibility of the ALJ to conduct the appropriate legal analysis and his written decision must include sufficient reasoning to permit the court to determine he has done so." *Johnson v. Colvin*, 2014 WL 2920847, at *4 (M.D. Ala. June 27, 2014). Here, the ALJ's failure to articulate "explicit and adequate" reasons for completely rejecting Milner's subjective testimony concerning his pain precludes the court from determining whether his reasoning is supported by substantial evidence.

Moreover, the ALJ's reference to Milner's somatoform disorder and his complaint of groin pain in 2006 has no apparent direct connection to or bearing on his headache complaints. The ALJ offers no clear explanation for how Milner's possible exaggeration of an unrelated injury—which occurred more than nine years before the date of the ALJ's opinion—discredits his testimony in the instant case. And, in any event, somatoform disorder does not lead to the conclusion that a person is lying or exaggerating about his symptoms. Rather, "[t]he distress [people with somatoform disorder] experience from pain and other problems they experience are real . . . [and] significantly affects daily functioning." *Somatic Symptom and Related Disorders*, WEBMD, https://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment#1 (last visited July 18, 2018). Thus, the court cannot conclude that, because Milner may have exaggerated a nine-year-old injury and been diagnosed with somatoform disorder at some point in his life, he is necessarily lying about or exaggerating his headache and neck pain and related symptoms. Accordingly, the court concludes that the ALJ's determination of Milner's credibility is not supported by substantial evidence.

**B.     Non-Examining Physician Opinions**

Milner also asserts that the ALJ improperly assigned significant weight to the opinions of Dr. Carmichael and Dr. Tovorov—two non-examining physicians. ALJs must consider the opinions of non-examining physicians. *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011); *see also* 20 C.F.R. § 404.1527(f). "The weight due to a non-examining physician's opinion evidence depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence." *Id.* If a non-examiner's opinion is consistent with the medical evidence in the record, it should be granted accordingly greater weight. *Id.* But where the opinion "contradicts the opinion of an examining physician," it is granted little weight. *Id.*

Here, the ALJ explicitly assigned weight to the opinions of four physicians: Dr. Todorov, Dr. Carmichael, Dr. Estock, and Dr. Kurtz. Only Dr. Kurtz, a psychologist, examined Milner, while Dr. Todorov, Dr. Carmiachel, and Dr. Estock are non-examining physicians. For the opinions of Dr. Todorov, Dr. Carmichael, and Dr. Estock, the ALJ assigned substantial weight, stating for all three that they were "consistent with the medical evidence as a whole and . . . not inconsistent with other doctor's opinions in file." R. 25. This conclusory statement sheds no light or specificity on the extent to which these opinions are supported by clinical findings and consistent with the medical evidence. Moreover, because the ALJ did not assign weight to the opinion of a treating physician, and only granted substantial weight to the psychological component of Dr. Kurtz' opinion, the court is unable to determine whether the ALJ considered if, and the extent to which, any of these opinions contradicts those of Milner's examining physicians regarding his

16

physical limitations. This is particularly problematic as "reports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision." *Spencer v. Heckler*, 765 F. 2d 1090, 1094 (11th Cir. 1985); *see also Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (finding substantial evidence did not support the ALJ's decision where, as here, the ALJ's RFC assessment "mirror[ed] the conclusions reached" by a non-examining physician). Thus, the ALJ's failure to articulate the basis for his consideration of the medical opinions of record constitutes an additional ground for remand.[8]

## V. CONCLUSION

Based on the foregoing, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and based upon the proper legal standards. It is therefore ORDERED that the decision of the Commissioner denying benefits is REVERSED and this matter REMANDED to the Administrative Law Judge for the purpose of issuing a new disability determination consistent with this opinion.

A final judgment will be entered separately.

DONE on the 27th day of July, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[8] Milner argues that this court should reverse the ALJ's denial of benefits and award benefits outright. Doc. 12 at 15. In the Eleventh Circuit, a district court may remand for entry of an order awarding benefits if "it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Here, without impermissibly adopting the role of factfinder and reweighing the evidence itself, the court cannot conclude that it is clear that the evidence establishes Milner's disability without a doubt. Thus, remand is proper.